## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Tina Norris, Sally Michalak and Wendy Loepp individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>—vs.—<br><br>Bluestem Brands, Inc., Blair, LLC, and Does 1–10,<br><br>Defendants. | Case No.: 16-cv-03954-ECT-TNL<br>The Honorable Eric C. Tostrud<br><br>**BRIEF IN SUPPORT OF UNOPPOSED MOTION TO DECERTIFY CONDITIONALLY CERTIFIED COLLECTIVE ACTION AND DISMISS NAMED PLAINTIFFS' CLAIMS WITH PREJUDICE** |

## I.      Introduction and Background

### A.      Plaintiffs' Allegations and Efforts to Conditionally Certify a Class

Plaintiff Tina Norris filed the first Complaint in this case on November 11, 2016 and served the Defendants with the summons and complaint on February 10 and 13, 2017.  (Dkts. 1, 9, 10.)  The lawsuit[1] generally alleges that Norris and two later named Plaintiffs, all call center workers at a Blair facility in Erie, Pennsylvania, were required to work off the clock before and after their shifts in violation of the overtime provisions of the Fair Labor Standards Act ("FLSA") and Pennsylvania state wage and hour laws.  (Dkt. 86.)  Plaintiffs further sought to certify a collective action under the FLSA and a Rule 23 class action under state law.  (*Id.*; Dkt. 1.)  Finally, Plaintiff Tina Norris alleges

---

[1] Norris's initial Complaint was later amended.  The currently operative complaint is the Second Amended Complaint.  (Dkt. 86.)

an individual retaliation claim under the FLSA related to her employment termination. (Dkt. 1, 86.)

Shortly after serving Defendants with the initial Complaint and before Defendants had answered or otherwise responded to that pleading, Plaintiffs filed their first Motion for Conditional Certification, seeking conditional certification of:

> All current and former Telephone Sales Agents [and] Customer Service Agents . . . employed by Bluestem Brands, Inc. and/or Blair, LLC . . . at Defendants' call centers in Pennsylvania, at any time in the last three years, [who] were not paid for off-the-clock work during their preliminary "boot-up" time and postliminary "call completion" time.

(Dkt. 23 *et seq.*)  Thus began a lengthy and contested effort to determine the ultimate scope of the conditionally certified class in this case, during which time Plaintiffs filed three successive motions for conditional certification and an objection to Magistrate Judge Leung's ruling on the second of those motions.  (Dkts. 23 *et seq.*, 77 *et seq.*, 103, 105, 148, 152 *et seq.*, 173.)

Finally, with Judge Leung's August 28, 2018 ruling on Plaintiffs' third and final motion for conditional certification, the scope of the conditionally certified class was set. (Dkt. 173.)  Although Plaintiffs had sought conditional certification of all employees working at Blair LLC facilities in Pennsylvania with respect to both their pre- and post-shift work, the conditionally certified class was confined to a single facility in Erie, Pennsylvania, and involved only Plaintiffs' pre-shift allegations.  (*See* Dkts 23 *et seq.*, 77 *et seq.*, 152 *et seq.* (Plaintiffs' Motions); Dkts 103, 173 (Judge Leung's Orders).)  Notice

was issued to several hundred current and former call center workers, and 107 people filed consents to join the case as opt-in plaintiffs.  Rollins Decl. ¶ 2.

With the scope of the conditionally certified class defined and the opt-in period closed, Magistrate Judge Leung scheduled a Court-sponsored settlement conference, which was most recently scheduled for February 13, 2019.  (Dkt. 178.)  The parties agreed to participate in targeted discovery in advance of that conference, including limited written discovery and the depositions of the three named Plaintiffs.  Rollins Decl. ¶ 3.

Defendants deposed the three named Plaintiffs on December 11 and 14, 2018.  *Id.* ¶ 4.  As set forth below, the depositions of the named Plaintiffs revealed that none of the Plaintiffs has a colorable argument that she is similarly situated to other collective action members with respect to the alleged violations advanced in Plaintiffs' lawsuit.  Following a brief series of meet-and-confer letters, Plaintiffs agreed with Defendants' contention that it would be in the best interests of the parties and the Court to stipulate to decertification of the conditionally certified class and to dismiss the named Plaintiffs' claims with prejudice.  *Id.* ¶ 5.  As Plaintiffs' counsel explained in their January 31, 2019 letter to the Court (Dkt.184), Plaintiffs reached this determination after evaluating the applicable evidence and in accord with Plaintiffs' counsel's obligations under Federal Rule of Civil Procedure 11.

Aside from agreeing that each party should bear its own fees and costs associated with the litigation following its dismissal, the parties did not reach any sort of settlement of the claims of either the named Plaintiffs or the opt-ins, and Defendants have not

3

provided any compensation in any form to Plaintiffs, opt-ins, or Plaintiffs' counsel in connection with this litigation, nor have they made any promises to do so.  (*Id.* ¶ 6.)

**B.      Discovery Giving Rise to the Parties' Determination that Conditional Certification Is Not Warranted.**

Plaintiffs' depositions revealed, in multiple ways, that they could not assert a claim for pre-shift off-the-clock work on their own behalf or on behalf of any other call center worker.  By way of background, Plaintiffs' case theory is and always has been premised on the notion that both Blair and Bluestem[2] "**required**" them to arrive at work early to boot up their computers and open various work-related computer programs before they were permitted to clock in for work.  Each Plaintiff supported these allegations with a sworn statement containing essentially the same claim:

> Defendants required me and other Telephone Sales Agents and Customer Service Agents to be ready to begin taking calls by the technical start times of our shifts.  This meant that Defendant required us to arrive to work early to boot up our computers and launch and log into all necessary programs . . . Only after we had completed this pre-shift procedure were we allowed to clock in.

(Norris Decl. ¶ 7, Dkt. 80; *see also* Michalak Decl. ¶ 7 (containing substantially the same language), Dkt. 81; Loepp Decl. ¶ 7, Dkt. 82 (same).)  Plaintiffs further alleged that this pre-shift work took up to 15 minutes to complete.  (Dkts. 80-84, Declarations, ¶ 7.)  And

---

[2] Blair was Plaintiffs' direct employer during the entire statutory period at issue in this litigation. Plaintiffs have alleged that Bluestem, which acquired Blair in July 2015, is their joint employer. Defendants dispute that Bluestem ever employed Plaintiffs in any capacity, directly or jointly.  For purposes of the instant motion, however, the Court may assume without deciding that Bluestem did employ Plaintiffs and still find decertification and dismissal to be appropriate.

Plaintiffs premised each of their three motions for conditional certification on this allegation that they were "required" to arrive at work early.

But Plaintiffs' deposition testimony revealed that their sworn statements are inaccurate. They further show that their experiences with respect to their allegedly "required" pre-shift work were dissimilar from the others' experiences. The evidence demonstrated this dissimilarity in multiple, material ways.

At the most basic level, the named Plaintiffs' testimony demonstrates that there was no policy or practice requiring pre-shift off-the-clock work. Specifically, Michalak (who, in her declaration, asserted she "regularly worked a significant amount of pre-shift off-the-clock time throughout [her] employment with Defendants," *see* Michalak Decl. ¶ 7, Dkt. 81) testified that anyone who believes there was even a practice of pre-shift work before Bluestem took over is mistaken. (Michalak Dep. 32:14-21, 49:20-52:8.) What is more, even after Bluestem "took over," there was still no "requirement" to perform pre-shift work; rather, the company at most made a "suggestion" to arrive at work early in an email. (*Id.* 30:9-32:21, 46:19-48:8.) She further testified that Paragraph 7 of her declaration—which the Court cited at least nine times in granting conditional certification (*see, e.g.*, Dkt. 103 at 13-15, 18)—incorrectly stated that "Defendants required" her to arrive at work early. (Michalak Dep. 129:16-130:13.)

Similarly, during Loepp's deposition, when Defendants' counsel asked Loepp to confirm her sworn statement that the alleged pre-shift work was a "requirement," Loepp, unprompted, corrected him and stated that it was *not* actually a requirement to arrive early at work. (Loepp Dep. 103:23-104:6.) Norris—contradicting her declaration,

5

interrogatories, and the basis for conditional certification—testified there were days when she did her alleged pre-shift work *during* her shift (while she was getting paid) and suffered no penalty for it (Norris Dep. 224:12-225:10, 254:6-258:13; Norris Decl. ¶ 7, Dkt. 80). She likewise testified she was not aware of any requirement as to the order in which she logged into Kronos, the company's timekeeping system through which employees clock in for work (Norris Dep. 146:14-147:20), which contradicts her previous sworn statement that "Only after we had completed this pre-shift procedure [of opening up other computer programs] were we allowed to clock in" (Norris Decl. ¶ 7, Dkt. 80).

Plaintiffs offered other affirmative testimony contradicting any claim of a common policy requiring off the clock work. For example, contradicting her declaration and interrogatories, Norris testified the times for most of the pre-shift tasks she completed varied wildly from day to day (Norris Dep. at 126:6-19, 127:22-130:14; Norris Decl. ¶ 7, Dkt. 80). She likewise testified she did *not* log into Skype (an instant messaging program) on many days because she found the program "annoying." (Norris Dep. at 144:17-145:21). This testimony directly contradicts her previous sworn statement that she was "required" to boot up Skype before clocking in and beginning her shift (Norris Decl. ¶ 7, Dkt. 80).

Equally significant, however, the evidence contradicted Plaintiffs' claims that they were even *in the building* during the periods in which they claimed a common policy "required" them to perform pre-shift work. For instance, Norris testified that she began keeping handwritten time records beginning in 2016, which Plaintiffs produced the week

6

before her deposition.  (Rollins Decl. Ex. E).  Norris further testified that these records show the actual time she started and stopped working each day, and that all she did between the time she wrote down on her handwritten calendar and the technical start time of her shift was her alleged pre-shift work.  (Norris Dep. 219:1-221:11, 222:8-223:11.)

But the timestamp data from her personal security card—which she used to enter the building where she worked, and which she testified she never gave to anyone else—tells a different story.  (Norris Dep. 139:15-140:18; Rollins Decl. Ex. E).  As just one example, on May 3, 2016, Ms. Norris wrote on her personal calendar that she started working at 12:19.  But her card swipe data reflects that she entered the building that day at 12:16, and then *again* at 12:24 (her shift was scheduled to start at 12:30 that day).  May 9 of the same year shows an identical pattern: Norris wrote on her calendar that she began work at 12:21; but on that date she entered the building at 12:19 and then *again* at 12:25. In fact, her complete card swipe history shows that she entered the building twice before her shift starts (necessarily meaning that she entered the building once, left it, then entered it again), on *seventy-five percent of the days that she worked.*  (Rollins Decl. ¶ 8).

Thus, Norris had a documented, regular practice of leaving the building after she arrived at work—and, on the days when she was keeping a handwritten calendar, this happened ***after*** the time she claims she started work for the day.  (Norris Dep. at 231:4-239:11.)  Norris acknowledges that she was a smoker during this time in her life.  And Defendants anticipate that, if this matter proceeds, Norris's former colleagues will testify that it was her regular practice to arrive at work, drop her things off at her desk, and then go outside to smoke.

7

Likewise, Michalak's access card data (Rollins Decl. Ex. F), shows her consistently arriving at work just a few minutes before the start of her shift—*long* after the 15 minutes before her shift that she claims she arrived at work following Bluestem's acquisition of the company.  (Michalak Dep. 28:4-12.)  (Before then, Michalak agreed she did not report to work early at all and her card swipe data accurately reflects her arrival time.)  Michalak has a highly individualized explanation for this discrepancy, which Defendants explore further below—in brief, she claims that every day she walked into the building with a large group of people, and someone else swiped her in.  *See* Section II.A.2, *infra*.  But before going in, she would leave her cell phone in the car.  She would then work for several minutes, then go back out to her car to call her son to tell him that she had made it to work.  She would then walk back into the building, but, on this second entry, always scanned her access card so that there would be a record of her in the building in the event of a fire.  Michalek conceded that a reasonable person would not believe she was telling the truth.  (*Id.*)

In addition to the foregoing, the Plaintiffs offered testimony that shed significant doubt on their ability to act as representatives of the conditionally certified class and any future Rule 23 class.

- Loepp, a named Plaintiff for the Rule 23 Breach of Contract Class, testified that she is not asserting a claim of her own in this case.  (Loepp Dep. 48:16-50:20.)

- Norris accused counsel for Defendants of being paid by the Clintons for their work at her deposition.  (Norris Dep. 19:2-15.)

- In response to being asked whether she had ever gone by any other names, Norris testified that multiple rappers (Snoop Dogg, Dr. Dre, Young Jeezy, Luda, the Bone Thugs, 50 Cent, and Kurtis) call her "2ReaL" during "conversations [she

8

has] with them from time to time" on Twitter.  (Norris Dep. 7:23-9:15.)  She later acknowledged that none of these people had ever responded to her tweets.  (*Id*. at 193:23-194:8.)

- She testified that she was visited by the Secret Service, which caused her Twitter account to be suspended, after she tweeted "about George Soros and his hedge firm in New York, the media wants to blow up this, that and the other.  How come you just won't go to that location and blow up his story?" (*Id*. at 9:14-10:19.)

- She believes George Soros "owns the machines that we vote off of."  She acknowledges she "could have" posted something on social media suggesting that people on the left were responsible for voter fraud and deserved the death penalty. (*Id.* at 15:23-16:19.)

- She feels as though there was and may still be a conspiracy between Blair, the federal government, and "corrupted California."  (*Id.* at 269:19-270:6.)

- She is an "independent agent" for "we the people."  (*Id.* at 306:15-24.)  "We the people are the masters.  Not the corporate people or the politicians."  She believes "we the people" have been brainwashed by the government and the politicians. (*Id.* at 35:17-25.)

- She believes "the whole government is part of the Illuminati.  My personal opinion.  So you can write that and put it in a frame.  Write it down." (*Id.* at 43:17-20.)  "My belief, yeah, is that the whole government is corrupt to the courts, to the justice system."  (*Id.* at 44:23-45:2.)

- She believes that President Obama is personally aware of her claims—or at least aware that she is working for "we the people"—because: (1) she tweeted at him (*Id.* at 304:23-311:25); (2) she personally served a subpoena on the CDC in Atlanta on behalf of a prison inmate who asked for her assistance (*id.*); and (3) when Obama first became president, the President of Mexico came to the U.S. to seek a "safe haven" here, and Norris explained to Obama, through a tweet, that this fact meant that Obama could now coordinate the democratic takeover of the House of Representatives (*id.* at 311:3-314:6).  When asked how the Mexican president arriving in the United States could help Obama effect the democratic takeover of the House, Ms. Norris responded, "[y]ou're going to have to just read up on it online or something, because that's what they did and that's what happened.  That's your own ignorance that you have to deal with."  (*Id.*).  When asked how she could know it was her tweet that prompted this democratic takeover, she said "I don't know if I was the one or not, but it seemed to happen after my message.  So I put two and two together.  And then shortly after that . . . a

military plane came in front of my house and did some fancy wing dip and flew off." (*Id.*)

Distilled, Plaintiffs' depositions revealed:

***First***, call center workers in Erie, Pennsylvania did not experience the application of a common policy at work "requiring" them to come to work before their shift—which is the central allegation on which Plaintiffs' claims rest and on which conditional certification was granted.

***Second***, Defendants have documentary evidence showing that Norris and Michalak, at least, were physically not inside their workplace for at least some period of time during the 10-15 minutes they previously claimed to have been working.

***Third***, Loepp's testimony confirms she is not even a member of the FLSA class and was under no requirement to arrive early at work.

***Fourth***, Norris's testimony raises serious questions about her ability to accept this Court's authority and rulings, her competence, and, by extension, her ability to adequately represent the class.

## II.    Legal Standard

"The fundamental inquiry in determining whether a collective action under § 216(b) is appropriate is whether or not the plaintiffs are 'similarly situated.'" *Smith v. Heartland Auto. Servs.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005) (citations omitted). The plaintiffs in a Section 216(b) action bear the burden of proving they can satisfy this inquiry. *Id.* And they must make this showing of being "similarly situated" *with respect to factors relevant to the violations they allege*—not merely with respect to their job

10

duties. *Id.* at 1152 (considering whether class of allegedly misclassified supervisors was similarly situated with respect to factors relevant to misclassification inquiry).

As this Court has already noted, courts typically follow a two-stage approach to the process of certifying an FLSA collective action: in the first stage, the court considers "minimal evidence" and determines, applying a "fairly lenient standard," "whether notice of the action should be given to putative collective action members" (Jan. 24, 2019, Order p. 7, Dkt. No. 181); at the second stage, the defendant moves for decertification, and the court analyzes the question of whether plaintiffs are similarly situated under a "stricter post-discovery standard." *Heartland Auto. Servs.*, 404 F. Supp. 2d at 1150.

Determining whether plaintiffs who have opted in to a collective action are similarly situated involves the consideration of "several factors," including the disparate factual settings of the individual plaintiffs; the various defenses which appear to be individual to each plaintiff; and fairness and procedural considerations. *Heartland Auto Servs.*, 404 F. Supp. 2d at 1150 (decertifying conditionally certified FLSA class where plaintiffs could not show they were similarly situated with respect to the factors necessary to establish they had been misclassified as exempt employees); *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050 (D. Minn. 2011); *Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929, 933-34 (E.D. Ark. 2012) (decertifying conditionally certified FLSA class where plaintiffs engaged in varying job duties and individualized inquiry was necessary to demonstrate any of them worked over 40 hours in a particular week).

Each of these three factors weighs in favor of decertifying the conditionally certified class in this case.

II.     **Argument**

A.  **The Conditionally Certified Class Should Be Decertified**

1.  **Plaintiffs' testimony and other evidence demonstrates Plaintiffs are not similarly situated to each other or other putative class members.**

Plaintiffs' collective action was conditionally certified based *solely* on the contention that Plaintiffs and others performing similar jobs were "required" to come to work early by as much as 15 minutes and perform a specific set of tasks in order to be "ready for the technical start of [their] shifts."  (Dkts. 80-84, Declarations ¶ 7; Dkt. 103, Order partially granting conditional certification motion at 14-15.)  This common refrain was repeated in Plaintiffs' declarations, in Plaintiffs' responses to interrogatories, and in Plaintiffs' three motions to conditionally certify a collective action.  (*See, e.g.*, Dkts. 80-84; Dkts. 23 *et seq.*, 77 *et seq.*, 152 *et seq.* (Plaintiffs' Motions).)  Judge Nelson concisely articulated Plaintiffs' theory of the case as follows:

> Particularly important to the Court's conclusion [that conditional certification beyond the Erie facility is inappropriate] is the fact that Plaintiffs are not alleging a specific company-wide policy of Defendants violates the FLSA.  Rather, what Plaintiffs seem to allege is that ***supervisors at Erie followed an unwritten policy that required [call center employees] to work off the clock before their shifts began.***

(Apr. 24, 2018, Order p. 18, Dkt. No. 18 (emphasis added).)

Thus, for Plaintiffs and opt-ins to proceed with their conditionally certified class, they must show they were "similarly situated" with respect to this alleged unwritten pre-shift work requirement.  *See Heartland Auto. Servs.*, 404 F. Supp. 2d at 1149.  But the evidence provided by Defendants and adduced during Plaintiffs' depositions shows not

only that no such requirement existed, but also that each named Plaintiff's experience with regard to her alleged pre-shift work was dissimilar from the other Plaintiffs' experiences.

As a preliminary matter, as Defendants explained in their oppositions to Plaintiffs' several motions for conditional certification, employees at the call center in Erie are managed by individual supervisors who oversee small teams of 10-15 people each.  (C. Dziendziel Decl. ¶ 16, Dkt. No. 47-1 Ex. C.)  These supervisors have authority and discretion to resolve issues that relate to the members of their team, including with respect to counseling and/or disciplining employees who violate time and attendance rules.  (*Id.* ¶¶ 17-18).  It is no surprise, then, that Plaintiffs—who held different kinds of jobs and worked different shifts and generally reported to different people[3]—had wildly dissimilar understandings and experiences with regard to any alleged "requirement" of pre-shift work:

Loepp, the Rule 23 class representative, testified that there was no requirement that call center workers arrive early at work at all; rather, it was her own personal desire to be "organized" that led her to arrive early.  (Loepp Dep. 103:15-104:17).

Michalak testified that, prior to 2016, there was no requirement that she arrive early at work and that her own personal habits with respect to her arrival time "varied."

---

[3] Norris was a Telephone Sales Agent who reported to supervisors named Theresa and Denise and worked from 12:30 p.m. to 9:00 p.m.  (Norris Dep. 96:20-25, 206:21-207:14, 223:12-18.)  Michalak, on the other hand, was a Customer Service Representative who worked from 9:00 a.m. to 5:30 p.m. during the last few years of her employment reported to supervisors named Annette and Theresa.  (Michalak Dep. 11:20-24, 17:19-18:20, 33:17-19.)  Loepp worked part time as a Telephone Sales Agent: sometimes she started at 8:00 a.m., sometimes she started at 11:00 a.m.  (Loepp Dep. 29:11-19, 82:11-20).

(Michalak Dep. 32:10-21.)  Then, sometime in 2016, Michalak claims that she and others received an email from the company "suggesting" that they come in 15 minutes early—but that even then the company "didn't put it as a requirement."  (Michalak Dep. 32:14-21, 30:9-31:13).  Of course, this brand-new allegation that one or both Defendants communicated *anything* about a pre-shift work "policy" in writing is a completely different allegation from the one on which this class was conditionally certified in the first place.  (Dkt. 173).

Of the three named Plaintiffs, only Norris maintains there was a "requirement" that she arrive at work early to begin preparing for her shift before she was clocked in for the day.  When pressed to give the source of this requirement, however (was it in writing?  Did a supervisor tell her she had to arrive early, and if so, which one(s)?), Norris's response was cryptic to say the least: "it was common knowledge through the thing." (Norris Dep. 147:3-22, 345:12-22).

In sum, the testimony of the three named Plaintiffs in this case seriously undermines the validity of their central claim that a pre-shift work requirement existed in the first place.  Of equal importance, however, their dissimilar experiences regarding pre-shift work render collective treatment of their claims untenable.

In *Smith v. Heartland Auto. Servs.*, for example, this Court considered whether a group of store managers who alleged they were misclassified as executive professionals exempt from the FLSA's overtime requirements could proceed as a collective action. 404 F. Supp. 2d 1144.  The Court was presented with evidence that the managers commonly spent less than 50% of their time on management duties but had varying

individual experiences with regard to the amount of control and discretion they exercised over their stores. *Id.* at 1151-54. For example, some store managers testified that their own supervisors "controlled everything [they] said and did," while others said they were the "go-to guy" in their store. *Id.* The Court granted the defendant's motion for decertification, noting that, while the plaintiffs had "made a showing of similarity with respect to some aspects of their positions as Store Managers," the individualized circumstances surrounding their ability to exercise discretion and control—another relevant factor in the classification analysis—rendered collective action treatment inappropriate. *Id.*

Of particular importance here, it is the testimony of the purported representative plaintiffs—not a scattering of random class members—that varies from the allegedly "common" policy requiring pre-shift work. In *White v. 14051 Manchester, Inc.*, 301 F.R.D. 368 (E.D. Mo. 2014), a case alleging a mandatory illegal tip pooling policy, the court found "one of the most troubling questions" in the case was "whether the testimony of the Named Plaintiffs [could] be considered representative of the experiences of the entire class." *Id.* at 375. The *White* court decertified the conditionally certified class, concluding that the Plaintiff's disparate experiences were "so dissimilar that the jury would not be able to discern what, if any, the true policy would be." *Id.* at 376.

The facts in this case merit the same result as in *Smith* and *White*: in light of the Plaintiffs' disparate testimony regarding the existence of a pre-shift work requirement and its alleged sources (per Michalak, a mystery email sent out the same year this lawsuit was filed; according to Norris, "common knowledge through the thing"), the only way

15

for any opt-in plaintiff to proceed with his or her claim would be to prevent individual

evidence of the source of this alleged requirement and its alleged impact on him or her.

These are precisely the sorts of circumstances in which FLSA actions must be decertified.

## 2. Analyzing each Plaintiffs' claim will require an individualized review of Defendants' rebuttal evidence and defenses.

Even if Plaintiffs could identify an allegedly common policy requiring pre-shift

work at the Erie facility, Defendants' rebuttal evidence is so highly individualized that

the only way to litigate any one person's claim is through testimony and evidence

regarding each individual opt-in plaintiff.

### a. Defendants' card swipe data

Nowhere is this more evident than with Defendants' card swipe data and

Plaintiffs' "rebuttals" to it.

As set forth in Section I.B, above, the data from Norris's personal security card

(which she used to get into the building each day) shows her entering the building two

different times before her shift started on about 75% of the days she worked.  These card

swipe events further occurred during the time she testified, under oath, that she was at her

desk working and for which she claims she is owed wages.  Of course, the most likely

explanation for Norris's card swipe data is that Norris was outside smoking—not

working—during the minutes leading up to her shift.  But Norris has not admitted that to

be the case: rather, she says she "doesn't know" what she was doing outside before her

shift, positing that she could have "went out there and grabbed something from [her]

supervisor" or "went out the door at 27.5 seconds and came back 3 seconds later" or "it

16

could have been the guy showing me his lawyer information"—she simply "can't tell

you." (Norris Dep. 240:10-244:11.) But she insists that, notwithstanding the

documentary evidence showing she was not at her desk when she claims she was, she is

still entitled to be paid for that time:

> Q:    I am looking at the data and the data is showing that you weren't
>       even in the building on the times you claim you're entitled to be
>       paid. I'm trying to understand how you could do that.
>
> A:    I must have been in the building because this was in the building. I
>       came in the building.

(Norris Dep. 245:24-246:4.)

Michalak's card swipe data also undermines her claims. (Rollins Decl. Ex. F.)

Her card was typically used to enter the building just once each day that she worked—

and on the vast majority of those days, the card swipe time shows she entered the

building far less than the 15 minutes she claimed she needed to perform all of her unpaid

work each morning.[4] Michalak's response to this discrepancy? She claims her card

swipe data reflects the second time she entered the building each day—that *each and

every* day, she had come into the building once before and someone else had swiped her

in. (Michalak Dep. 75:10-90:21.) She alleges that she then would "get as much done at

the position as [she] could," then "go back out to [her] car to get whatever [she'd] left in

[her] car for the time and [she] would have to swipe in then because nobody was there."

---

[4] For example, in June 2016, Michalak used her card to enter the building on 17 different days. On 14 of those days, Michalak entered less than 10 minutes before her shift started; and on 8 occasions she entered 6 minutes or less before her shift started.

(Michalak Dep. 79:25-88:16).   She further claims she would go back out to her car to call her son to "let him know [she] was at work."   (*Id.* at 82:1-9).

Like Norris's excuses, Michalak's explanation of Defendants' card swipe data strains credulity.   Indeed, Michalak conceded at her deposition that a reasonable person would not believe her story.   (Michalak Dep. 182:1-183:9.)   And to rebut these stories, Defendants would need to present individualized evidence: for example, Defendants should be entitled to subpoena and offer as evidence Michalak's cell phone records to show that she was not, in fact, calling her son every morning from her car, and to call Norris's co-workers to testify that they observed her leaving the building on most days to go smoke right before her shift started.

Collective action defendants have "a right to attack the accuracy of testimony, particularly representative testimony." *White*, 301 F.R.D. at 377 (emphasis added).   And "such individual questioning would likely make it difficult and confusing for the fact finder." *Id.*  Thus, Norris's and Michalak's unbelievable—and highly individual— response to Defendants' card swipe data also merits decertification. *See Soderberg v. Naturescape, Inc.*, 2011 U.S. Dist. LEXIS 156235, at *31-32 (D. Minn. 2011) (noting that the defendant argued that certain plaintiffs had questionable credibility "as to whether the overtime hours reported were accurate" and planned to "present individualized defenses as to the credibility of each plaintiff," rendering "collective treatment unmanageable").

b.      *Part-time employees with no cognizable FLSA claim*

Perhaps even more fundamentally, there are likely dozens of class members like Wendy Loepp who simply have no cognizable claim for overtime under the FLSA.  Of the 107 people who opted in to this case, at least 52 of them were most recently "part time" employees—meaning they were scheduled to work fewer than 40 hours per week. (Rollins Decl. ¶ 9.)  Determining whether these people have any claim at all for overtime compensation would require an individualized review of their pay records and, in many cases, their testimony to determine whether they ever worked more than 40 hours in a week during their employment.

For example, Loepp—also a part-time employee—worked forty hours in both of her first two weeks of her employment while she was completing her training, but acknowledges that she is not claiming she engaged in any pre-shift work during that time. (Loepp Dep. 60:5-61:1.)  She did not work even close to 40 hours per week—and therefore has no claim for overtime—in any other week.  (Loepp Dep. 50:16-24.) Assessing whether other part-time employees with full weeks of training are or are not asserting an overtime claim for those weeks would similarly require individual testimony from them, destroying any efficiencies gained from collective action treatment.  *See Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929 (E.D. Ark. 2012) (decertifying an overtime FLSA collective action where some opt-ins testified they "never worked more than 40 hours in a week" because the defendant would have individualized defenses as to those class members).

### 3. Procedural and fairness concerns preclude Tina Norris from representing others in this action

Finally, procedural and fairness considerations merit decertification of Plaintiffs' collective action. First, the disparate facts inherent in each individual's claim—whether a "requirement" to perform pre-shift work actually applied to him or her; whether he or she actually engaged in this work; and whether Defendants' documentary evidence undermines the validity of Plaintiffs' statements—necessarily make a representative trial unmanageable. *Arnold v. DirecTV, LLC*, 2017 U.S. Dist. LEXIS 48472, at *29-32 ("disparate facts . . . make it impracticable to try the claims of the named Plaintiffs and the opt-in Plaintiffs in a collective action").

Furthermore, the named Plaintiffs in this case can hardly be considered adequate representatives of the class's interests. Defendants seriously question whether Norris is *competent* to testify before this Court given her bizarre, meandering, and wholly incredible deposition testimony. At a minimum, though, she certainly is not *adequate* to represent the dozens of other call center workers who opted into this case. Not only did she directly contradict significant portions of her sworn statements in her deposition testimony; she also testified she believes this Court has been infiltrated by the illuminati. (Norris Dep. 43:8-22.) How can she adequately prosecute the claims of dozens of other people when she herself does not trust the authority of the body overseeing these legal proceedings? *See, e.g.*, *Sondel v. Northwest Airlines*, 1993 U.S. Dist. LEXIS 21252, at *28 (D. Minn. 1993) (class representatives must "be able and willing to prosecute the case *competently* and vigorously); *see also Espenscheid v. DirectSat USA, LLC*, 705 F.3d

770 (7th Cir. 2013) ("[C]ase law has largely merged the standards [for certification of a Rule 23 class and a collective action under the FLSA] . . . .")

Nor will the opt-in plaintiffs be prejudiced by decertification: their claims have been tolled since the time they filed their consent forms agreeing to participate in this case, and nothing prevents them from pursuing those claims on an individual basis. *Redman v. U.S. W. Bus. Res.*, 153 F.3d 691, 695 (8th Cir. 1998) (noting that an individual commences an action under the FLSA when he or she files his written consent to become part of the action); *Orduna v. Champion Drywall, Inc.*, 2013 U.S. Dist. LEXIS 43367, at *3-4 (D. Nev. 2013) (collecting cases and determining an FLSA opt-in plaintiff's claim is tolled from the date he files his opt-in form through the date the court decertifies the collective action).

### B.  The Named Plaintiffs' Claims Should Be Dismissed With Prejudice

Finally, the Court noted its concern with a dismissal of the named Plaintiffs' claims with prejudice, which was understandably based on the Court's recognition of the possibility that the parties had reached a settlement of Plaintiffs' claims that should have been subject to the Court's approval.  (Jan. 24, 2019, Order at Section B (Dkt. 181.)

But as discussed above, the evidenced adduced during discovery warrants dismissal and decertification without payment of a settlement or any other form of compensation.  And given that Plaintiffs and Defendants have not reached a settlement agreement and that Defendants have not paid any compensation to Plaintiffs in any form (nor have they agreed to do so), Defendants respectfully submit that Plaintiffs' claims

21

were effectively dismissed with prejudice by way of the parties' Rule 41 stipulation and request that the Court recognize that dismissal.

## III.   Conclusion

For the foregoing reasons, Defendants respectfully request the Court grant Defendants' unopposed motion for decertification and recognize the dismissal of the claims of the named Plaintiffs.


Dated:  February 25, 2019                    FAEGRE BAKER DANIELS LLP

*s/ Andrew B. Murphy*
Andrew B. Murphy
  *Andrew.Murphy@FaegreBD.com*
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766–8897
Facsimile: (612) 766–1600

Samantha M. Rollins
  *Samantha.Rollins@FaegreBD.com*
  (admitted *pro hac vice*)
801 Grand Ave., 33rd Floor
Des Moines, IA 50309
Telephone: (515) 447-4726
Facsimile: (515) 248-9010

*Attorneys for Defendants Bluestem Brands, Inc. and Blair LLC*